## STATE v. GEORGE
(No. 1509; March 5, 1929, 275 Pac. 112)

*W. F. Mecum* and *Raymond & Fitzgerald*, for appellant.

*William O. Wilson,* Attorney General, and *Richard J. Jackson,* Assistant Attorney General, for respondent.

*W. F. Mecum* and *Raymond & Fitzgerald*, in reply.

RINER, Justice.

Robert George was tried in the District Court of Converse County on an information charging him with the larceny of twenty-one sheep belonging to the Fiddleback Company, a Wyoming corporation. A conviction having resulted, he appeals, and in this discussion, he will be referred to either by his own name or as the ''defendant'' for the sake of clarity, as other parties of the same surname appear in the record.

An outline of the case for the State touching the matters material to be considered here, is shortly this: One James Cooper, who had worked at odd jobs in four or five different states and had come to Wyoming about six month previous to the occurrences we have now to consider, was staying at the home of Harry George and meanwhile was engaged in trappng for furs. Harry George was a brother of the defendant, as was also Hu-

bert George presently to be mentioned. It appears that the family has lived in Wyoming for many years.

Cooper testified that on January 1, 1925, Harry George suggested that they steal some of the Fiddleback sheep which were being kept on what was called the Dunn ranch, not far from the Harry George home on LaBonte; that the same day Harry and he discussed the matter with the defendant in the front room of the latter's home, after dinner; that the defendant then said he would take all the sheep he had money to buy at $3.50 per head; that Cooper stated he would get the sheep and take them to Harry's place, whereupon the defendant remarked that he had a man who would take them out of the country; that Cooper and Harry made an effort to get sheep that same night, but failed; that from January 1st to and including January 5th, 1927, Cooper, in the course of several trips to where the sheep were kept, stole either twenty-one or twenty-three of them from the Dunn ranch, the thefts being committed about seven o'clock in the morning and the sheep carried to and placed in a chicken house located near Harry George's home; that on the evening of January 3, 1927, Cooper met the defendant, both went over to the location of the sheep, and after talking with the herders in control of the animals, Cooper and defendant went back across the creek, rode through the sheep and each got one; that they carried the animals up the creek and tied them in the brush. Cooper testified that he remembered no conversation being had with any of the George brothers by him before he started out on these several trips to get sheep. Other than those mentioned above, no more sheep appear to have been taken. Cooper also stated on the witness stand, that on each of the evenings of the 3rd and 5th respectively of January, 1927, about 9:30 or 10:00 o'clock, the defendant came and got him, both then went to the chicken house where the sheep had been put by Cooper and there they found one George Hammond with a team and wagon; that they loaded ten sheep

each time into the wagon and then Hammond drove away with the sheep towards the west; that thereafter in February sometime, defendant paid Cooper $3.50 and told him that Hubert George owed defendant $50 and he would have Hubert pay Cooper that amount and "that would square us all the way around." A check was received in evidence in that amount, dated February 23, 1927, payable to Cooper and signed by Hubert George. On cross examination Cooper admitted that he was in jail charged with the theft of these sheep, that he had given a bad check and had to borrow money from Hubert George to make it good; that he had worked for Hubert from July to October, 1926, in the preceding year; that he had borrowed $50 from Hubert to apply on the purchase price of an auto, which he bought March 12, 1927; that Hubert shipped furs for Cooper along with his own fur shipments and paid him for them; that Cooper began work again for Hubert March 3, 1927, and remained engaged there until he was arrested for stealing these sheep on April 25th following. It was proven by the testimony of the court reporter that Cooper had made previous contradictory statements concerning the details of stealing the sheep.

From the testimony of the Fiddleback manager, Carol Mohr, it appeared that the company had about three thousand sheep at the Dunn ranch; that on the 13th or 14th of February, 1927, upon a check of them made for the first time since the preceding October, there were about a hundred found missing; that he went with the sheriff of Converse County to John Spracklin's place on or about May 1, 1927, and identified eighteen sheep as the property of the Fiddleback Company, these sheep not having on them the brand which was put on the herd when it was checked in February preceding; that he did not know whether the sheep found at Spracklin's were in the band when the check of it was made in February, neither did he know when these sheep got away from the Fiddleback herd, nor that the sheep claimed to have been taken by

Cooper were gone that day. A motion to strike out all of this witness's testimony relating to these sheep found at Spracklin's because no sufficient foundation was made and no connection between those and the ones claimed by the State to have been stolen was shown, was overruled and exception was saved by the defendant. On recall the same witness stated that the Dunn ranch was supposed to be sheep tight, but he did not believe it was.

The sheriff of Converse County also testified to making the trip with Mohr to Spracklin's, and over the objection and exception of defendant, told of finding some tracks four miles from the Spracklin ranch. He did not undertake to give any testimony as to the nature of the tracks or any details concerning them.

Another witness testified for the State that between the 25th of February and the 5th of March, 1927, right after sunup, he saw George Hammond on the road that goes past the Dunn ranch, driving south, with a four horse team with sheep in a wagon which was covered with canvas except in one place. This road does not go by the Spracklin place, though it goes in that general direction. The witness did not see much of the wagon driver's face, as he had a sheepskin coat collar turned up, and wore a cap.

John Spracklin was also a witness for the State and gave testimony to the effect that George Hammond came over to his place with a team and wagon twice, about the 1st and 10th of January, 1927, respectively; that the first time he came to get some wood and pay a small bill, and the second time to get a bull he had purchased from a neighbor; that Mohr and Sheriff Peyton came to look at the sheep because Spracklin had notified the sheriff sometime between April 25th and before May 1st that there were some stray sheep in his bunch; that he reported the strays after Cooper's arrest and the same day he noticed them in his herd. On cross examination he testified that he lived in Albany county about seventeen miles from the

Dunn ranch, and that he had sheep of his own; that Hammond did not leave any sheep at his place on either occasion he was there; that if he had left sheep there, he, Spracklin, would have known it, for several men had been helping with the feeding and "we know they had not been there;" that there was no evidence in the wagon which Hammond used of sheep being transported in it; that Hammond was never at Spracklin's place after this second trip in January, up to the middle of May or June and never came there with a four horse team.

At the conclusion of the State's case, the defendant renewed his motion to strike all of Mohr's testimony regarding the sheep found and taken from Spracklin's band. This motion was overruled and defendant duly reserved his exception.

For the defense there was testimony that for three-quarters of a mile the Dunn ranch had only a three-wire fence, and part of the year 1926, in October, where the fence crosses the creek, it was completely down for a while. Harry George and the defendant each as a witness specifically denied Cooper's testimony detailing their alleged connection with the theft of the sheep, and stated in substance that neither had had anything to do with such an arrangement as Cooper had related. Harry George testified that on the afternoon of the 7th of January, 1927, he found about twenty head of sheep in the chicken coop on his place; that he hunted up Cooper and told him to take the sheep away, and that the next morning they were gone. There was also testimony that about January 1, 1927, Cooper had endeavored to find a purchaser for sheep at $3 a head. Hubert George related sundry transactions he had had with Cooper and denied that the $50 check was given at the defendant's request. Hubert stated that this amount was a loan to Cooper when the latter bought his car. He also denied that he owed the defendant, his brother, any money in February, 1927; that Cooper and Hubert George had a final settlement

after the former's arrest and the loan above mentioned was paid back by Cooper. George Hammond, another witness for the defense, denied any connection with the stealing of the sheep, as testified to by Cooper, or that he hauled any sheep away or had any knowledge of the theft. Hammond also corroborated the State's witness Spracklin as to his visits to the latter's place in early January, 1927, and their purpose. He also denied driving the four horse team and wagon and meeting the witness who testified to his hauling sheep with an outfit of that sort the latter part of February or the early part of March, 1927, and stated that he never hauled the sheep as related by that witness for the State; that during the past year he never owned or used a cap or sheepskin coat.

It is argued for the defendant that there was error in the court's admission and subsequent refusal to strike out Mohr's testimony as to the sheep found at Spracklin's place, and, as we view the matter, this contention must be sustained. A careful examination of the record makes it very plain, as we think, that not the slightest connection was established by the prosecution between the sheep found at Spracklin's place and the sheep alleged to have been taken by Cooper and the defendant, Robert George. Indeed, as has already been recited, the State's own witness, John Spracklin, swears that Hammond never left any sheep at his—Spracklin's—place on the several trips he made there in January, never came there after that time up to the middle of May or June of that year, and never came there at all with a four horse team. These statements Hammond, a witness for the defense, specifically corroborated. The positive testimony of these witnesses stands in the record before us undisputed. Mohr, the manager of the Fiddleback Company, could not and did not identify the sheep found at Spracklin's as the animals claimed to have been stolen. No other witness attempted to do so. Mere conjecture cannot take the place

of proof in any rational system of legal procedure. The rule upon the point is thus stated in 36 C. J. 896, where it is said:

"But until some evidence of a criminal connection between accused and a third person is shown, evidence of possession of the stolen property by such third person is not admissible against accused."

In Buchanan v. State, 109 Ala. 7, 19 So. 410, which was a trial for the larceny of some calico, hair combs and several yards of elastic, as well as other property, it was held error to receive in evidence a dress pattern of calico, hair combs and a piece of elastic found at the home of defendant's mother who lived a short distance from the home of defendant, there being no identification of the property thus found with that stolen, except its general similarity.

A like conclusion was reached in the case of State v. Rawson, 259 S. W. (Mo.) 421, and although it there appeared that the defendant and his brother each occupied one of two apartments on the same floor of an apartment house, and property identified as some of that stolen was found in the brother's rooms, yet it was said:

"The court erred in admitting evidence showing possession of the stolen goods by the defendant's brother, there being nothing whatever to connect the defendant with such possession, since he had no control over his brother's apartment, and was not shown to be even a visitor there."

Another larceny case dealing with the matter now being considered is that of Clark v. State, 80 Tex. Crim. App. 374, 189 S. W. 737. There also it was held error to admit evidence that articles similar to those stolen but not clearly identified as the articles purloined, were found in the possession of another person the day after the arrest

of the accused, there being no testimony showing any acting together between this person and the defendant.

Moore v. State, 32 Tex. Crim. App. 405, 25 S. W. 626, decided the point that it was error to admit evidence against a defendant charged with the larceny of a mule, that a mule previously identified as stolen property was seen in the pasture of the father of defendant, where there was no evidence adduced to connect the defendant therewith.

To the same effect is Ballow v. State, 42 Tex. Crim. App. 261, 58 S. W. 1023. In burglary cases a similar rule has been invoked. See State v. Brundidge, 118 Ia. 92, 91 N. W. 920; State v. Martin, 118 S. C. 21, 110 S. E. 78. See also McNeally v. State, 5 Wyo. 59, 36 Pac. 824, as to the general principle involved.

In all of these cases cited from other jurisdictions, the judgment of the trial court was reversed for the error in admitting evidence of the character concerning which complaint is here made.

The testimony of the sheriff of Converse county, relative to alleged tracks of animals found more than four miles from the Spracklin place and more than four months after the larceny charged, was also objectionable and should not have been admitted. It was vague and indefinite and was in no manner connected, so far as we can perceive, with the crime charged against the defendant. The admission of such evidence could only tend to prejudice him before the jury, without throwing any light upon the real issues in the case.

It results from what we have said, that for the errors we have mentioned, the judgment must be reversed and the defendant granted a new trial. We are the more ready to reach this conclusion in view of the testimony of the principal State's witness Cooper, which close analysis shows to present inherent discrepancies and inconsistencies, aside from his impeachment relative to previous

statements made concerning the commission of the crime charged.

*Reversed.*

BLUME, C. J., and KIMBALL, J., concur.